## UNITED STATES DISTRICT COURT
## DISTRICT OF COLORADO

| | |
|---|---|
| PAYTON TURPIN, derivatively on behalf of nominal defendant OPPENHEIMER CORE BOND FUND, | ) ) ) ) |
| | **CIVIL ACTION NO.** |
| Plaintiff, | |
| vs. | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| JOHN V. MURPHY, BRIAN W. WIXTED, WILLIAM L. ARMSTRONG, ROBERT G. AVIS, GEORGE C. BOWEN, EDWARD L. CAMERON, JON S. FOSSEL, SAM FREEDMAN, BEVERLY L. HAMILTON, ROBERT J. MALONE and F. WILLIAM MARSHALL, | **JURY TRIAL DEMANDED** |
| Defendants, | |
| and | |
| OPPENHEIMER CORE BOND FUND, | |
| Nominal Defendant. | |

Plaintiff, Payton Turpin ("Plaintiff"), by the undersigned attorneys, derivatively on behalf of the Oppenheimer Core Bond Fund (the "Fund"), alleges upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Securities and Exchange Commission ("SEC") filings, news reports and other publicly available documents regarding the Fund, as follows:

## NATURE OF THE ACTION

1.     Plaintiff brings this action derivatively for the benefit of the Fund against the members of its Board of Trustees (the "Board") and certain of its executive officers seeking to remedy defendants' breaches of contract, breaches of fiduciary duty and other violations of law.

2.     On or about April 27, 2007, the Fund filed with the SEC on Form N-1A and disseminated to investors a Registration Statement, Prospectus and Statement of Additional Information ("SAI") (collectively referred to as the "2007 Prospectus").

3.     The following year, on or about April 29, 2008, the Fund filed with the SEC on Form N-1A and disseminated to investors a Registration Statement, a Prospectus and SAI (collectively referred to as the "2008 Prospectus").

4.     The 2007 Prospectus and 2008 Prospectus (collectively referred to as the "Contract") created a binding contract between the Fund on the one hand and each investor, including Plaintiff, on the other.

5.     Under the terms of the Contract, in exchange for an investor investing in the Fund and paying management fees, the Fund agreed to, *inter alia*, seek shareholders' approval, via the affirmative votes of a majority of the Fund's outstanding voting securities, prior to making any "fundamental change" to the Fund or its operations and to provide shareholders with notice of any "non-fundamental change" at least 60 days prior to the change.

6.     Investors, including Plaintiff, performed under the contract by purchasing and holding shares in the Fund and paying management fees.

7.     The Individual Defendants (defined herein) breached the Contract and their fiduciary duties by fundamentally changing the Fund's investment objective without first providing investors with notice and without holding a shareholder vote as required by the

Contract.   As a result of the Individual Defendants' breaches of contract and breaches of fiduciary duties, the Fund has suffered tremendous losses in value.

### JURISDICTION AND VENUE

8.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 in that Plaintiff and Defendants are citizens of different states and the matter in controversy exceeds $75,000, exclusive of interests and costs.  This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

9.      Venue is proper in this district because a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, occurred in this district.  One or more of the defendants either resides in or maintains executive offices in this district, and defendants have received substantial compensation in this district by engaging in numerous activities and conducting business here, which had an effect in this district.

### PARTIES

10.     Plaintiff is a shareholder of the Fund and has been a shareholder of the Fund continuously at all relevant times hereto.  Plaintiff is a citizen of the State of North Carolina.

11.     Nominal Defendant Oppenheimer Core Bond Fund is a mutual fund and a series of Oppenheimer Integrity Funds, a Massachusetts business trust.  The Fund has five classes of shares, which are: Core Bond Fund Class A; Core Bond Fund Class B; Core Bond Fund Class C; Core Bond Fund Class N; and Core Bond Fund Class Y.  The Fund and its trustees are responsible for ensuring that the Fund adheres to its stated objectives.  The Fund maintains its principal place of business at 6803 South Tucson Way, Centennial, Colorado.

12.     Defendant John V. Murphy ("Murphy") was, at all relevant times, the President, Principal Executive Officer and trustee of the Fund, having held such positions since 2001. Defendant Murphy signed or authorized the signing of the 2007 and 2008 Prospectuses.  Upon information and belief, Murphy is a citizen of the Commonwealth of Massachusetts.

13.     Defendant Brian W. Wixted ("Wixted") was, at all relevant times, Treasurer and Principal Financial & Accounting Officer of the Fund, having held this position since 1999. Defendant Wixted signed or authorized the signing of the 2007 and 2008 Prospectuses.  Upon information and belief, Wixted is a citizen of the State of Colorado.

14.     Defendants Murphy and Wixted are herein collectively referred to as the "Officer Defendants."

15.     Defendant William L. Armstrong ("Armstrong") was, at all relevant times, the Chairman of the Board of Trustees of the Fund.  Armstrong became a trustee in 1999 and Chairman in 2003.  Defendant Armstrong signed or authorized the signing of the 2007 and 2008 Prospectuses.  Upon information and belief, Armstrong is a citizen of the State of Colorado.

16.     Defendant Robert G. Avis ("Avis") was, at relevant times, a trustee of the Fund. Defendant Avis signed or authorized the signing of the 2007 Prospectus.  Upon information and belief, Avis is a citizen of the State of Florida.

17.     Defendant George C. Bowen ("Bowen") was, at all relevant times, a trustee of the Fund.  Bowen became a trustee in 2001.  Defendant Bowen signed or authorized the signing of the 2007 and 2008 Prospectuses.  Upon information and belief, Bowen is a citizen of the State of Colorado.

18.     Defendant Edward L. Cameron ("Cameron") was, at all relevant times, a trustee of the Fund.  Cameron became a trustee in 2001.  Defendant Cameron signed or authorized the

signing of the 2007 and 2008 Prospectuses.  Upon information and belief, Cameron is a citizen of the State of Florida.

19.     Defendant Jon S. Fossel ("Fossel") was, at all relevant times, a trustee of the Fund.  Fossel became a trustee in 1990.  Defendant Fossel signed or authorized the signing of the 2007 and 2008 Prospectuses.  Upon information and belief, Fossel is a citizen of the State of Montana.

20.     Defendant Sam Freedman ("Freedman") was, at all relevant times, a trustee of the Fund.  Freedman became a trustee in 1996.  Defendant Freedman signed or authorized the signing of the 2007 and 2008 Prospectuses.  Upon information and belief, Freedman is a citizen of the State of Colorado.

21.     Defendant Beverly L. Hamilton ("Hamilton") was, at all relevant times, a trustee of the Fund.  Hamilton became a trustee in 2002.  Defendant Hamilton signed or authorized the signing of the 2007 and 2008 Prospectuses.  Upon information and belief, Hamilton is a citizen of the State of Connecticut.

22.     Defendant Robert J. Malone ("Malone") was, at all relevant times, a trustee of the Fund.  Malone became a trustee in 2002.  Defendant Malone signed or authorized the signing of the 2007 and 2008 Prospectuses.  Upon information and belief, Malone is a citizen of the State of Colorado.

23.     Defendant F. William Marshall ("Marshall") was, at all relevant times, a trustee of the Fund.  Marshall became a trustee in 2001.  Defendant Marshall signed or authorized the signing of the 2007 and 2008 Prospectuses.  Upon information and belief, Marhall is a citizen of the State of Florida.

24.     Defendants Armstrong, Avis, Bowen, Cameron, Fossel, Freedman, Hamilton, Malone and Marshall are collectively referred to hereinafter as the "Trustee Defendants."

25.     Defendants Murphy, Wixted, Armstrong, Avis, Bowen, Cameron, Fossel, Freedman, Hamilton, Malone and Marshall are collectively referred to hereinafter as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

26.     By reason of their positions as officers, trustees, and/or fiduciaries of The Fund and because of their ability to control the business and corporate affairs of The Fund, the Individual Defendants owed the Fund and its shareholders fiduciary obligations of good faith, loyalty and candor, and were and are required to use their utmost ability to control and manage the Fund in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of the Fund and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.  Each trustee and officer of the Fund owes to the Fund and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Fund and in the use and preservation of its assets, and the highest obligations of fair dealing.

27.     The Individual Defendants, because of their positions of control and authority as trustees and/or officers of the Fund, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Fund.  Because of their advisory, executive, managerial, and directorial positions with the Fund, each of the Individual Defendants had knowledge of material non-public information regarding the Fund.

28. To discharge their duties, the officers and trustees of the Fund were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Fund. By virtue of such duties, the officers and trustees of The Fund were required to, among other things:

    a.    exercise good faith to ensure that the affairs of the Fund were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of the Fund;

    b.    exercise good faith to ensure that the Fund was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority an in accordance with the terms of the Contract; and

    c.    when put on notice of problems with the Fund's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

## SUBSTANTIVE ALLEGATIONS

### Terms of the Contract

29. According to the 2007 Prospectus, "Oppenheimer Core Bond Fund is a mutual fund that seeks total return. It invests primarily in investment-grade bonds and U.S. government securities." 2007 Prospectus at 2 (emphasis added). "Generally, the 'total return' sought by the Fund consists of income earned on the Fund's investments, plus capital appreciation, if any, which generally arises from decreases in interest rates, improving credit fundamentals for a particular sector or security, and managing pre-payment risks associated with mortgage-related securities, as well as other techniques." *Id.* at 4.

30. The 2007 Prospectus further stated that the Fund's investment objective is to seek "total return by investing mainly in debt instruments." *Id.* at 158. (emphasis added).

31.     In describing the Fund's risk profile, the 2007 Prospectus acknowledged that investors are exposed to some level of risk, but it represented that the Fund's investment thesis resulted in relative stability for investors.   According to the 2007 Prospectus, "the Fund's emphasis on investment-grade securities may make its share prices less volatile than high-yield bond funds or funds that focus on foreign bonds." *Id.* at 6.  The 2007 Prospectus also stated that the Fund was suitable for retirement accounts:  "The Fund is intended as a long-term investment, not a short-term trading vehicle, and may be appropriate for a part of an investor's retirement plan portfolio." *Id.* at 4.

32.     With respect to any changes to the Fund's fundamental policies, the Fund agreed that "fundamental" changes would not be made without approval from a majority of its shareholders.  Specifically, the Fund's 2007 Prospectus stated, "Fundamental policies cannot be changed without the approval of a majority of the Fund's outstanding voting shares. The Fund's investment objective is a fundamental policy." 2007 Prospectus at 11 (emphasis added). *See also* SAI (dated April 29, 2008) at 12 (fundamental polices cannot be changed with approval from a majority of the Fund's outstanding voting securities).  Moreover, for non-fundamental changes to the composition of the Fund's investments, the 2007 Prospectus stated that such changes would not be made without providing 60 days' notice to the Fund's investors.  2007 Prospectus at 2 ("WHAT DOES THE FUND MAINLY INVEST IN? As a  non-fundamental policy (which will not be changed  without  providing 60 days'  notice to Fund  shareholders). . . ."); *Id.* at 2 ("The Fund's policy to invest at least 80% of its net assets (plus borrowings) in investment grade bonds is not a fundamental  policy; however, it cannot be changed without 60 days prior notice to shareholders").

33. Defendants repeated the statements set forth in ¶¶ 29-31 in the 2008 Prospectus. *See* 2008 Prospectus at 2, 3, 5.

34. Based on the Fund's stated investment objective, investors were led to believe that the Fund maintained a relatively conservative investment portfolio, which among other things was suitable for retirement accounts, and that if the Fund's investment objectives changed, investors would be allowed to vote on the change as is required under the terms of the Contract.

**Defendants Breached the Contract**

35. Notwithstanding the Fund's stated responsibilities under the Contract, beginning in late-2007 or early 2008, Defendants breached the terms of the Contract by altering the Fund's investment objective without seeking approval from a majority of the Fund's shareholders as is required by the plain language of the Contract.

36. Specifically, beginning in late-2007 or early 2008, Defendants substantially increased the Fund's exposure to risk by leveraging the Fund's assets to invest in derivative instruments (credit default swaps and total return swaps).  The new investment objective, which relied heavily on derivative instruments, changed the Fund's fundamental investment objective from a "Core" fund investing primarily in investment grade bonds and U.S. governmental securities into a substantially more aggressive "Core Plus" fund with significant exposure to highly risky derivative instruments.

37. A credit default swap enables an investor to buy or sell protection against a credit event, such as an issuer's failure to make timely payments of interest or principal, bankruptcy or restructuring.  Generally, if the Fund buys credit protection using a credit default swap, the Fund makes fixed payments to the counterparty and if a credit event occurs, the Fund delivers the defaulted bonds underlying the swap to the swap counterparty and the counterparty pays the

Fund par for the bonds.  If the Fund sells credit protection using a credit default swap, generally the Fund receives fixed payments from the counterparty and if a credit event occurs, the Fund pays the swap counterparty par for the defaulted bonds underlying the swap and the swap counterparty delivers the bonds to the Fund.  If the credit default swap is on a basket of securities, the notional value of the swap is reduced by the par amount of the defaulted bonds, and the fixed payments are then made on the reduced notional value.  During the relevant time period, the Fund purchased and sold credit default swaps.

38.     In a total return swap transaction, one party agrees to pay the other party an amount equal to the total return on a defined underlying asset or a non-asset reference during a specified period of time.  The underlying asset might be a security or basket of securities or a non-asset reference might be a securities index.  In return, the other party would make periodic payments based on a fixed or variable interest rate or on the total return from a different underlying asset or non-asset reference.  Total return swaps could result in losses if the underlying asset or reference does not perform as anticipated.  Total return swaps can have the potential for unlimited losses.  During the relevant time period, the Fund substantially increased its exposure to total return swap transactions.

39.     Thus, while the 2007 and 2008 Prospectuses stated that the Fund's investment objective seeks returns by "investing mainly in debt instruments," in reality the Fund fundamentally changed its investment objective to seek returns by placing speculative bets on highly risky derivative instruments and making these bets by borrowing against the Fund's assets. As explained by Morningstar analyst Eric Jacobson:

> By the end of March [2008], the Core portfolio carried around $400 million in securities exceeding its (then) $2.2 billion in net assets via transactions that were effectively akin to margin borrowing. It also had roughly $800 million in long exposure to corporate credit via default swaps--including American International

Group (AIG), Lehman Brothers, Wachovia (WB), Washington Mutual, and Bear Stearns--and around $600 million in total return swap exposure to a volatile slice of Barclays' AAA rated CMBS index, all of which by normal reporting convention were not included on the fund's balance sheet and thus not in its net assets. By the end of September, just before the Treasury Department's Troubled Asset Relief Program proposal and right around the time the market sailed off into uncharted mania, Core Bond's credit exposure to those various markets totaled more than 180% of net assets on a dollar basis. In other words, *for every dollar of shareholder capital in the fund, it was exposed to the credit-driven movement of more than $1.80 worth of securities.*

*Id.* (emphasis in original).

40. The absolute dollar value of Fund's exposure to derivatives is astonishing on its own, and when compared to Fund's $2.2 billion net asset value Defendants' breach of their obligations under the Contract becomes clear. While investors were promised that the Fund would seek returns by "investing mainly in debt instruments," by March of 2008 the Fund's $2.2 billion in net assets were exposed to $1.4 billion in derivative instruments ($800 million in credit default swaps and $600 million in total return swaps) and by September 2008 "for every dollar of shareholder capital in the fund, it was exposed to the credit-driven movement of more than $1.80 worth of securities." The Fund's increasing exposure to derivative instruments, reaching $1.4 billion by March 2008, was a fundamental change of its investment objective, which, pursuant to the Contract, required approval from a majority of the Fund's outstanding shares.

41. Notwithstanding the Individual Defendants' contractual obligations to seek shareholder approval before changing the Fund's investment objectives, at no time during the relevant period were investors asked to approve the Fund's new investment objectives nor were they informed of the Fund's new investment approach. As noted by Eric Jacobson:

The only thing worse than levering up a portfolio with 180% market exposure, though, is doing it quietly. I'd like to be wrong about this, but I can't imagine that the average shareholder or advisor with a stake in these funds knew that they were leveraged in any way. The word itself doesn't seem to be linked to any of the funds' strategies anywhere I've searched on Oppenheimer's Web site or in any of

> the supporting shareholder or marketing materials that we've seen. Terminology
> aside, none of the portfolio descriptors provides enough information to estimate
> those market exposures, much less know that they're not typical, 100 cents in, 100
> cents invested. There's just no indication whatsoever that anything is unusual
> about any of the funds that employ this kind of leveraged exposure. And it was
> never brought up by Oppenheimer managers in any of their recent Morningstar
> analyst interviews.

Eric Jacobson, "Oppenheimer Bond Funds Missed the Forest Fire for the Trees," *Morningstar*,
Dec. 17, 2008.  *See also* Patrick McDevitt, "Oppenheimer's Bond-Fund Blowup: Worse Than
You Think," Market Watch, Apr. 20, 2009 ("[the Fund's annual report] contained no mention of
the sort of strategies the funds were engaging in.").

42.    The Individual Defendants deprived shareholders of their contractual right to
approve changes to the Fund's fundamental investment policy.   Ultimately, the Fund and
investors sustained massive losses because of the Fund's significant exposure to derivative
instruments as credit markets faltered in September 2008.  As explained by Miriam Sjoblom:

> the team's liberal use of swaps to gain exposure to corporates and CMBS has
> made matters far worse. The market for CMBS total-return swaps, for example,
> seized up in the wake of September's financial-sector upheaval.

> Meanwhile, those CMBS swaps, the corporate swaps, and the fund's other
> holdings added up to credit market exposure well beyond the dollar value of the
> fund's net assets, amplifying the impact of losses on the overall outcome.

Miriam Sjoblom, "We've lost confidence in Oppenheimer Core Bond," Morning Star, Dec. 17,
2008.

43.    For the year ended December 31, 2008 the Fund lost 36% of its value.   In
contrast, "[the Fund's] benchmark index, the Barclays Capital Aggregate Bond Index [the
Benchmark], rose 5.2%" in 2008.  *See* Shefali Anand and Craig Karmin, "Oregon Sues Over
Risks Taken In Its '529' Fund," *The Wall Street Journal*, Apr. 14, 2009.

44.     The Fund's substantial deviation from the performance of the benchmark index further illustrates a fundamental shift in the Fund's investment objective.  The losses suffered by investors were unexpected in light of the Fund's stated investment objective.  As explained by Andrew Gogerty, analyst at investment researcher Morningstar Inc.:

> "Core Bond is an intermediate-term bond fund," he said. "You don't expect a fund like that to lose so much value."  Gogerty said the fund's losses weren't just because of bad securities, but because of the extra risk that may not have been apparent to shareholders.
>
> "Specifically, the managers bought complex, off-balance-sheet swap contracts that created a leveraging effect on the funds," he said. No attempt was made to communicate to shareholders that these funds were taking on additional risk, Gogerty said.

Sam Mamudi, "Mutual flubs," Market Watch, Feb. 5, 2009.  *See also* Patrick McDevitt, "Oppenheimer's Bond-Fund Blowup: Worse Than You Think," Market Watch, Apr. 20, 2009 ("At their core, bond funds [like the Fund] have one primary mission. . . . Most of us own bond funds, simply, to provide our portfolios with an anchor when the stock market storms are raging.").

45.     Sustaining massive losses from the decision to increase the Fund's exposure to derivatives, by December 2008 the Individual Defendants attempted to increase the Fund's exposure to bonds.  *See* Miriam Sjoblom, "We've lost confidence in Oppenheimer Core Bond," Morning Star, Dec. 17, 2008 ("The managers have since replaced many CMBS contracts with bonds").

46.     However, market observers saw the Fund's effort to replenish its bond positions as being too little too late.  According to Morningstar analyst Miriam Sjoblom, "it's upsetting that they [the Fund's managers] didn't anticipate the dangers of the fund's derivative positions in this dysfunctional market. And it's unacceptable that the firm hasn't more clearly communicated

the fund's exposure to various sectors and risks in shareholder reports and web commentary." Miriam Sjoblom, "We've lost confidence in Oppenheimer Core Bond," Morning Star, Dec. 17, 2008.

### The State of Oregon Files Suit On Behalf of the State's College Savings Plan

47.     The Fund's changes to its fundamental investment objectives caused the State of Oregon to file suit claiming that the Fund's new policies were not communicated to Oregon's College Savings Plan, which invested assets in the Fund.

48.     On April 13, 2009, following a three-month investigation by John Kroger, the Attorney General for the State of Oregon (the "Oregon Attorney General"), Oregon Treasurer Ben Westlund and the Oregon Attorney General announced that Oregon filed a lawsuit against OppenheimerFunds, Inc. ("OFI"), among others, alleging that the defendants inappropriately placed funds from the Oregon College Savings Plan into the Fund without disclosing that the Fund was taking on extreme risks. *See The State of Oregon v. Oppenheimer v. OppenheimerFunds, Inc.*, No. 09C014018 (Or. Cir., Marion County, filed Apr. 13, 2009) (the "Oregon Action").  According to the April 13, 2009 press release, the Oregon Attorney General's investigation "found that Oppenheimer Funds represented that certain investments were appropriate for conservative and ultra-conservative portfolios -- but shuttled college savings instead into a hedge-fund like investment fund that took extreme risks in a search for speculative large returns."

49.     The press release further stated, "The character of the OppenheimerFunds Core Bond Fund changed in 2007 and 2008 . . .  yet neither the state nor investors were alerted that the fund had become significantly more aggressive and risky."

50.     According to the Oregon Action, on October 23, 2008, OFI admitted to Oregon that rather than operating the Fund as a "Core Bond Fund" the Fund was managed as a "Core Plus" fund.  According to the Oregon Action, the distinction between operating as a "Core" as opposed to a "Core Plus" fund has significant implications to the fund's investors.  While Core funds seek excess returns relative to a benchmark of 75 basis points, Core Plus funds seek excess returns of 100 to 125 basis points relative to the same benchmark, or 165% greater than the returns sought by a Core fund.  The excess returns are possible only by taking excess risks. Management of the Fund under a Core Plus strategy was fundamentally different from its stated investment objectives and accompanying risk profile.

51.     The Fund has itself tacitly admitted that it altered the fundamental investment objectives for the Fund.  In the Fund's most recent prospectus (dated April 30, 2009) under the section marked "WHO IS THE FUND DESIGNED FOR?" the Fund no longer states that the Fund may be appropriate for an investor's retirement plan portfolio.

52.     The Individual Defendants' failure to obtain shareholder approval to change the Fund's investment objective was a breach of their obligations under the Contract and caused the Fund to sustain heavy damages, as alleged herein.

### The Individual Defendants' Breaches of Fiduciary Duties

53.     The Fund's fundamental change in its investment objective to exceptionally risky derivative instruments, and the failure to obtain shareholder approval for such a change or even notify shareholders of such a change, were the direct result of the Individual Defendants' breaches of fiduciary duties.

54.     In breach of their fiduciary duties, the Individual Defendants knowingly caused or allowed the Fund to make these changes without providing shareholders with notice or holding a vote seeking shareholder approval, as required by the Fund's Contract.

55.     In particular, the Individual Defendants failed in good faith to:

a.     Notify shareholders of the fundamental change in the Fund's investment objective; and

b.     Obtain shareholder approval before implementing the fundamental change in the Fund's investment objective.

56.     Through their signing of the Contract, the Individual Defendants knew that they were required to notify shareholders and obtain shareholder approval before implementing a fundamental change in the Fund's investment objective.

57.     In breach of their fiduciary duty of good faith and loyalty, the Individual Defendants willfully ignored the Contract, failing to follow the requirements contained therein.

58.     The Individual Defendants' failure to notify shareholders or obtain shareholder approval for a fundamental change in the Fund's investment strategy, along with their actions that fundamentally changed the Fund's investment strategy, caused the Fund to suffer severe losses in value.

## DERIVATIVE AND DEMAND ALLEGATIONS

59.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

60.     Plaintiff brings this action derivatively in the right and for the benefit of the Fund to redress the Individual Defendants' breaches of fiduciary duties.

61.     Plaintiff is a shareholder of Nominal Defendant Oppenheimer Core Bond Fund, was a shareholder of the Fund at the time of the wrongdoing alleged herein, and has been a shareholder of the Fund continuously since that time.

62.     Plaintiff will adequately and fairly represent the interests of the Fund and its shareholders in enforcing and prosecuting its rights.

63.     The Individual Defendants' improper practices were not, and could not have been, the result of an exercise of good faith business judgment.  On the contrary, the improper practices were the result of bad faith conduct that is not protected by the business judgment rule.

64.     The Fund was organized as a series of Oppenheimer Integrity Funds, a Massachusetts business trust.  Under Massachusetts law, Plaintiff is required to make a demand a on the Board, at which point the Board has ninety days to considered the demand in good faith and take necessary action.

65.     On July 28, 2009, more than 90 days ago, Plaintiff made a demand (the "Demand") on the Board to commence an action against the Individual Defendants.  A copy of Plaintiff's Demand is attached hereto as Exhibit A.

## COUNT 1

### AGAINST THE INDIVIDUAL DEFENDANTS
### FOR BREACH OF FIDUCIARY DUTY

66.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

67.     As alleged herein in detail, the Individual Defendants had a duty to, *inter alia*, exercise good faith to ensure that the Fund was operated in a diligent, honest and prudent manner and complied with its obligations under the Contract and, when placed on notice of improper or imprudent conduct by the Fund and/or its employees, exercise good faith in taking action to correct the misconduct and prevent its recurrence.

68.     The Individual Defendants breached their fiduciary duties by knowingly causing or allowing the Fund to change its investment objective and pursue a far riskier investment objective without obtaining shareholder approval or notifying shareholders, as alleged herein.

69.     As a direct and proximate result of Defendants' breaches of fiduciary duties, the Fund has sustained damages including, but not limited to, severe losses in value.

<u>COUNT II</u>

<u>AGAINST THE INDIVIDUAL DEFENDANTS<br>FOR BREACH OF CONTRACT</u>

70.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

71.     Plaintiff and other investors entered into the Contract with the Fund as to the management of investments in the Fund.  The Fund offered those terms to, *inter alia*, Plaintiff and other investors, and Plaintiff and other investors accepted.

72.     Plaintiff and other investors performed under the Contract by investing in the Fund and paying management fees.

73.     The Fund breached the Contract by changing its investment objective and pursuing a far riskier investment objective without obtaining shareholder approval or notifying shareholders, as alleged herein.

74.     As a direct and proximate result of the Fund's breaches of contract, the Fund has sustained damages including, but not limited to, severe losses in value.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

a.     Awarding the Fund the amount of damages sustained by the Fund as a result of the Individual Defendants' breaches of fiduciary duties and breaches of contract;

b.   Granting appropriate equitable relief to remedy the Individual Defendants' breaches of fiduciary duties and breaches of contract;

c.   Awarding Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accounts' and experts' fees, costs, and expenses; and

d.   Granting such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury.

Dated: November 6, 2009

Respectfully submitted,

JEFFREY M. VILLANUEVA P.C.

_____*/s/Jeffrey M. Villanueva*_____
Jeffrey M. Villanueva
Nicole S. Schram
1755 Blake Street, Suite 225
Denver, Colorado 80202
Telephone: (303) 295-7525
Facsimile: (303) 295-7511

BARROWAY TOPAZ KESSLER
 MELTZER & CHECK, LLP
Eric L. Zagar
Michael J. Hynes
J. Daniel Albert
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

THE WEISER LAW FIRM, P.C.
Robert B. Weiser
Brett D. Stecker
121 N. Wayne Avenue
Suite 100
Wayne, PA 19087
Telephone: (610) 225-2677
Facsimile: (610) 225-2678

*Counsel for Plaintiff*